IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01464-NYW

MERCED OJEDA PEREZ,

    Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Nina Y. Wang

    This civil action arises under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33, for review of the Commissioner of the Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Merced Ojeda Perez's ("Plaintiff" or "Ms. Ojeda Perez") application for Disability Insurance Benefits ("DIB"). Pursuant to the Parties' consent [#18], this civil action was referred to this Magistrate Judge for a decision on the merits. *See* [#29]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **AFFIRMS** the Commissioner's decision.

## LEGAL STANDARDS

    An individual is eligible for DIB benefits under the Act if he is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002). Additionally, the claimant must prove she was disabled prior to her date last insured. *Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2007).

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). These include:

1. Whether the claimant has engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment or combination of impairments;

3. Whether the claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1;

4. Whether the claimant has the Residual Functional Capacity ("RFC") to perform her past relevant work; and

5. Whether the claimant can perform work that exists in the national economy, considering the claimant's RFC, age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "The claimant bears the burden of proof through step four of the analysis[,]" while the Commissioner bears the burden of proof at step five. *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted).

In reviewing the Commissioner's final decision, the court limits its inquiry to whether substantial evidence supports the final decision and whether the Commissioner applied the correct

legal standards. *See Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty*, 515 F.3d at 1070 (internal citation omitted); *accord Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) ("Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."). "But in making this determination, [the court] cannot reweigh the evidence or substitute [its] judgment for the administrative law judge's." *Smith v. Colvin*, 821 F.3d 1264, 1266 (10th Cir. 2016).

**ANALYSIS**

**I.  Background**

**A.  Medical History**

Ms. Ojeda Perez, born September 26, 1957, alleges she became disabled May 1, 2015, at 57 years-of-age, due to a bulging disc in her back. *See* [#16-6 at 189, 192].[1] On May 19, 2014, Ms. Ojeda Perez visited the Salud Family Health Centers because of a cold. [#16-7 at 275]. Her physical exam noted that she was "alert and oriented x3, in no acute distress, well developed and well nourished" and had a regular heartbeat. [*Id.*].

On August 20, 2014, Ms. Ojeda Perez began treatment with Katherine Rufner, M.D.; the treatment relationship lasted until October 2015. *See* [#16-7 at 301, 352]. Ms. Ojeda Perez's initial complaint was "waist pain" with general complaints of "back pain" that was worse on the left and "some sensation that her left leg falls asleep." [*Id.* at 301]. General exam results showed a "well developed and well nourished appearance," a regular heart rate and rhythm with no

---

[1] When citing to the Administrative Record, the court utilizes the docket number assigned by the Electronic Court Filing ("ECF") system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page. For all other documents the court cites to the document and page number generated by the ECF system.

3

murmur, no acute distress, and "negative straight leg raise bilaterally." [*Id.*]. Dr. Rufner began Plaintiff on a daily ibuprofen regiment. [*Id.*].

On November 4, 2014, Ms. Ojeda Perez treated with Dr. Rufner for a consultation on headaches. [#16-7 at 299]. Ms. Ojeda Perez presented alert and oriented, in no acute distress, with a "well developed" general appearance, and regular heart rhythm, and displayed normal strength in all extremities with no edema. [*Id.*]. A month later, on December 6, 2014, Ms. Ojeda Perez returned with complaints of nausea and vomiting. [*Id.* at 273]. Her treatment notes indicate she was "alert and oriented," "in no acute distress, well developed, and nourished," and her general exam revealed a regular heart rate and rhythm and no edema in her extremities. [*Id.*].

On February 4, 2015, Ms. Ojeda Perez presented to Dr. Rufner with complaints of worsening back pain that radiated into her right leg. [#16-7 at 292]. General exam results revealed that Ms. Ojeda Perez was "alert and oriented x3, [in no acute distress], well developed and well nourished," had a regular heart rate and rhythm, and a positive right straight leg test. [*Id.*]. Dr. Rufner referred Ms. Ojeda Perez to physical therapy and ordered an MRI without contrast, which revealed "diffuse bulging of the intervertebral disc and moderate facet arthropathy" and "mild to moderate foraminal stenosis at the L4-5 and L5-S1 levels" but otherwise relatively mild findings at other levels. [*Id.* at 292, 307].

In March 2015, Plaintiff presented to orthopedic surgeon Scott Dhupar, M.D. and complained of back pain and some tingling and weakness. *See* [#16-7 at 349]. Dr. Dhupar observed that Plaintiff had normal toe- and heel-walk and a tandem gait; a negative straight leg raise test; slightly reduced strength; and some tenderness to palpation. [*Id.* at 350]. Dr. Dhupar suggested Plaintiff try non-operative options, including medication, physical therapy, traction,

activity modification, rest, brace therapy, chiropractic treatment, acupuncture, and local heat/cold/massage, and if those were not effective, she could consider surgery. *See* [*id.* at 351].

On April 2, 2015, Ms. Ojeda Perez visited Dr. Rufner and complained of being unable to sleep due to her back and leg pain as well as feeling dizzy. *See* [#16-7 at 290]. General exam results revealed that Ms. Ojeda Perez was "alert and oriented x3, [in no acute distress], well developed and well nourished"; that her heart rate was "regular" and "normal"; and that her neurological results were "grossly normal, . . . motor strength 5/5 all extremities, normal sensation to light touch, DTR's normal and symmetric, normal coordination, normal speech." [*Id.*]. Ms. Ojeda Perez stated that a neurosurgeon recommended she have back surgery; however, Ms. Ojeda Perez did not want to undertake surgery due to a history of heart palpitations, though her EKG returned normal. *See* [*id.* at 290-91]. Dr. Rufner also provided Plaintiff with a note for work that prohibited Plaintiff from lifting more than five pounds. *See* [*id.* at 291].

On May 2, 2015, Ms. Ojeda Perez was discharged from physical therapy after receiving four treatments because she reached "maximum medical improvement." [#16-7 at 278]. Findings of the physical therapist included "significant trigger points and tightness in the bilateral iliopsoas and quadratus lumborum" and "weakness in the left L4 and L5 myotomes." [*Id.* at 279]. The physical therapist also noted that Ms. Ojeda Perez "demonstrates dermatomes that are within normal limits and symmetrical in the lower extremities." [*Id.*]. In addition to these objective findings, Ms. Ojeda Perez indicated pain ranging between an eight and ten on a ten-point scale and stated that she is awakened one-to-two times per night due to symptoms. [*Id.*]. She described both her sitting and standing tolerance as thirty minutes. *See* [*id.*].

On June 2, 2015, Ms. Ojeda Perez returned to Dr. Rufner after suffering a fall that resulted in a bruised arm and injured back. *See* [#16-7 at 288]. A general exam of Ms. Ojeda Perez revealed

that she was "well developed and well nourished" and in no acute distress; Dr. Rufner prescribed ibuprofen and ordered an X-ray of Plaintiff's spine. *See* [*id.*]. Plaintiff returned to Dr. Rufner on June 18, 2015 complaining of a "cough/ no sleep," and her general exam results revealed that Plaintiff was "alert and oriented x3, anxious, chronically ill appearing," had a regular heart rate and rhythm, and her musculoskeletal/extremities were normal and unremarkable. [*Id.* at 281]. On June 23, 2015, Ms. Ojeda Perez received treatment for stomach pain and a cold from Dr. Rufner, who described Ms. Ojeda Perez as "well developed and well nourished" and with a regular heart rate and rhythm. [*Id.* at 286].

On July 22, 2015, Ms. Ojeda Perez presented to Dr. Rufner with the flu. [#16-7 at 284]. General exam results reveal that Plaintiff was "well developed and well nourished" and had a regular heart rate and rhythm. [*Id.*]. Dr. Rufner acknowledged that Ms. Ojeda Perez was being cleared for surgery and would undergo a holter monitor. [*Id.*].

On August 17, 2015, a cardiologist examined Ms. Ojeda Perez. [#16-7 at 314]. The cardiologist performed an abnormal stress myocardial perfusion exam finding "a small area of reversible myocardial perfusion defect, suggestive of possible myocardial ischemia." [*Id.*]. Ms. Ojeda Perez achieved "7 METs with shortness of breath and fatigue with no chest pain" on her stress test. [*Id.* at 325-26].

On October 27, 2015, Ms. Ojeda Perez saw Dr. Rufner for abdominal pain, back pain, and right-hand numbness. [#16-8 at 399]. Treatment notes reveal a positive carpal tunnel syndrome test; Ms. Ojeda Perez also stated that she continued to experience back pain and felt that she could not work due to the pain and her carpal tunnel, that she was not able to lift or walk or sit for a long time, and that two orthopedic surgeons recommended surgery on her back, though she was waiting for her husband to have surgery first. [*Id.*]. On October 29, 2015, Dr. Rufner completed a General

Residual Functional Capacity Questionnaire for Ms. Ojeda Perez, assessing various functional limitations and indicating that Plaintiff's back pain is "very debilitating." *See generally* [#16-7 at 352-357].

B.  **Procedural History**

On June 1, 2015, Plaintiff filed her application for DIB. *See* [#16-2 at 20]. The Social Security Administration initially denied Plaintiff's application administratively on October 1, 2015. *See* [*id.*]. Ms. Ojeda Perez submitted a request for a hearing before an Administrative Law Judge ("ALJ"), which ALJ Jon L. Lawritson ("the ALJ") held on June 28, 2017. *See* [*id.*]. The ALJ received testimony from the Plaintiff, through an interpreter, and Vocational Expert Ashley Bryars (the "VE") at the hearing. *See generally* [*id.* at 40-82].

Ms. Ojeda Perez testified that she currently worked in the kitchen of By the Rockies and currently works there one day per week; she previously worked 40-hours per week but within the past year she reduced her schedule to 3-days per week and then to 1-day per week. [#16-2 at 77]. Ms. Ojeda Perez testified that she must stand all day for her job and is only able to sit when she has a break. *See* [*id.* at 78]. Plaintiff also worked as a gardener and as a cook. *See* [*id.*]. When asked why she was not working full-time, Ms. Ojeda Perez testified that she cannot work full-time because she "can't stand it" due to experiencing "a lot of pain" and her inability to "be moving quickly" and "bend[ing] forward." *See* [*id.*]. Though she could stand all day in the past, Ms. Ojeda Perez testified that she had to take "a lot of pills" to do so and still experienced lots of pain. *See* [*id.* at 78-79].

Ms. Ojeda Perez went on to testify about the nature of her pain describing it as affecting all her lower back and traveling down her legs to her calf. [#16-2 at 78]. She explained that she has more bad days than good days—with bad days consisting of a "lot of pain" and good days

7

(typically once a week) consisting of less pain because she has rested. *See* [*id.* at 82]. Plaintiff further testified that at home she must alternate between standing for two hours and sitting for 30 minutes; that she is sometimes unable to sleep at night due to the pain she experiences; that she can lift only ten pounds; and that she can sit for between 2-3 hours, walk for about 15 minutes, and described difficulty bending over. *See* [#16-2 at 78-80]. As to her daily activities, Ms. Ojeda Perez testified that she can cook, do laundry, and grocery shop with the help of her husband and an electric scooter. *See* [*id.* at 81-82]. Ms. Ojeda Perez also testified that she cannot work due to damage to both her hands and numbness that results from using her hand, though she explained that she can drive, make a fist, and can hold a pen and write. *See* [*id.* at 80-81].

The ALJ then took the testimony of the VE. [#16-2 at 83-86]. The VE summarized Ms. Ojeda Perez's past relevant work to include short order cook, a specific vocational preparation ("SVP")[2] of 3, and a light job; and production worker, a specific vocational preparation ("SVP") of 2, and a light job. [#16-2 at 86]. The VE then testified that an individual who could perform light work, subject to several exertional and non-exertional limitations, could perform Ms. Ojeda Perez's past relevant work. *See* [*id.*]. The VE concluded that if the ALJ's hypothetical individual also needed to sit down and take a 20-minute break every hour, there would be no work available to Ms. Ojeda Perez. *See* [*id.*].

On September 25, 2017, the ALJ issued a decision denying Plaintiff's application for DIB. [#16-2 at 21]. The ALJ concluded that Ms. Ojeda Perez:

---

[2] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991)); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003).

8

1. had met the insured status requirements through December 31, 2020, and had not engaged in substantial gainful activity since the alleged onset date;

2. had the severe impairments of: degenerative disc disease of the lumbar spine, ischemic heart disease, right hand carpal tunnel syndrome, and bronchitis;

3. had no impairment or combination of impairments that met or medically equaled a listing; and

4. had the RFC to perform light work, subject to various limitations, and could perform her past relevant work.

[*Id.* at 22-24]. Thus, at step four the ALJ determined Ms. Ojeda Perez was not disabled. [*Id.* at 27]. Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner. *See* [*id.* at 1]. Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on June 29, 2018, invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

On appeal, Ms. Ojeda Perez challenges the ALJ's RFC assessment, arguing the ALJ inappropriately failed to give controlling weight to Plaintiff's treating physician Dr. Rufner and that the ALJ erred in finding her failure to seek medical treatment was evidence of medical improvement. [*Id.* at 3-6]. For the following reasons, I conclude that substantial evidence supports the ALJ's decision.

## II. The RFC Assessment – Weighing the Medical Opinions

In formulating a claimant's RFC, the ALJ must consider the combined effect of all the claimant's medically determinable impairments, including the severe and non-severe. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016). A claimant's RFC is the most work the claimant can perform, not the least. 20 C.F.R. § 404.1545; SSR 83-10. "'The RFC assessment must include a narrative discussion describing

9

how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.")). The ALJ need not identify "affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category," and the court will uphold the RFC assessment if it is consistent with the record and supported by substantial evidence. *See Howard v. Barnhart*, 379 F.3d 945, 947, 949 (10th Cir. 2004).

In assessing a claimant's RFC, the ALJ must also address medical source opinions. *See Vigil v. Colvin*, 805 F.3d 1199, 1201-02 (10th Cir. 2015). The Social Security regulations afford a treating source opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *cf. Garcia v. Colvin*, 219 F. Supp. 3d 1063, 1071 (D. Colo. 2016) ("The distinction between *not inconsistent* and *consistent* is significant. The treating source opinions should not be accorded controlling weight if they contradict other substantial evidence in the record, but they do not necessarily have to reach the exact same conclusions." (emphasis in original)). Generally, the opinion of an examining source is entitled to more weight than the opinion of a non-examining source. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); 20 C.F.R. § 404.1527(c)(1). Indeed, the opinion of a treating or examining source is in no way "dismissable," *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012), and may be dismissed or discounted only upon an examination of the factors provided in

the regulations and "specific, legitimate reasons for rejecting it[,]" *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).

But even if the ALJ does not afford the treating source opinion controlling weight, the ALJ owes that opinion deference and must weigh that opinion using all the factors provided in 20 C.F.R. § 404.1527(c)(1)-(6). *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); SSR 96-2p, 1996 WL 374188, at *4. These factors include:

1. the length of the treatment relationship and the frequency of examination;
2. the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;
3. the degree to which the physician's opinion is supported by relevant evidence;
4. consistency between the opinion and the record as a whole;
5. whether or not the physician is a specialist in the area upon which an opinion is rendered; and
6. other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation marks omitted). Ultimately, the ALJ's findings must be "sufficiently specific to make clear" the weight assigned to the treating source opinion and the reasons for that weight. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (internal quotation marks omitted); *accord Golden-Schubert v. Commissioner, SSA*, 773 F. App'x 1042, 1050 (10th Cir. 2019) ("An ALJ is not required to expressly discuss each factor in deciding what weight to give a medical opinion.").

The ALJ determined that Ms. Ojeda Perez retained the RFC to "perform light work as defined in 20 CFR 404.1567(b). The claimant can occasionally stoop and frequently crawl. The claimant could occasionally be exposed to fumes, odors, dust, gases, and other pulmonary irritants." [#16-2 at 24]. Though believing Ms. Ojeda Perez's ailments caused some of the alleged disabling pain, the ALJ explained that the objective medical evidence revealed generally normal findings. *See* [*id.* at 25]. For instance:

- a February 2015 MRI of the lumbar spine revealed mild to moderate narrowing and stenosis;

- an August 2015 Plaintiff stress test revealed "a very small area of reversible myocardial perfusion defect" and "normal cardio functioning";

- a September 2015 physical exam revealed mild diffuse lower back pain but full range of motion and normal extremities;

- an October 2015 physical exam revealed carpal tunnel, likely requiring surgery, and that two providers recommended back surgery, but Ms. Ojeda Perez was waiting until her husband had surgery; and

- an August 2016 physical exam revealed back pain that was unabated by over-the-counter medications, though relaxation helped, and otherwise generally normal exam findings.

[*Id.* at 25-26]. The ALJ also noted that Plaintiff "worked twenty-five hours per week" during the relevant timeframe, and thus reduced Ms. Ojeda Perez to light exertional work given her degenerative disc disease, carpal tunnel syndrome, and ischemic heart disease. [*Id.* at 26].

In assessing Plaintiff's RFC, the ALJ considered the opinions of Dr. Rufner.[3] At an April 2, 2015 appointment, Dr. Rufner provided Plaintiff a note for work that Plaintiff was not to lift more than 5 pounds. *See* [#16-7 at 291]. In an October 2015 General Residual Functional Capacity Questionnaire, Dr. Rufner indicated that Plaintiff suffers from back pain, fatigue, hand numbness/tingling, an abnormal gait, tenderness, muscle spasm, and impaired sleep. *See* [*id.* at 352-53]. As to Plaintiff's functional limitations, Dr. Rufner opined that Plaintiff needed a job that allowed for shifting from sitting, standing, walking, and lying down, and that Plaintiff could: occasionally and frequently lift 10 pounds; stand and walk for 2 hours per day, with the need to

---

[3] The ALJ also considered the medical opinion of state agency disability determination examiner James McElhinney, M.D. The ALJ afforded great weight to Dr. McElhinney's opinion that Plaintiff could perform light work, occasionally stoop, frequently crawl, and must avoid concentrated exposure to irritants. *See* [#16-2 at 26]. Ms. Ojeda Perez does not challenge that opinion on appeal and thus the court does not consider it.

rest every hour; sit for 2 hours per day, with the need to change positions every hour; walk around for an hour; occasionally stoop, twist, crouch; never climb stairs or ladders; occasionally reach overhead and forward; and rarely handle, finger, or feel. [*Id.* at 353-55]. According to Dr. Rufner, Plaintiff's back pain "is very debilitating," requiring Plaintiff to lie down in the waiting room if sitting for over 30 minutes, and would cause Plaintiff to miss 2-3 days of work per month. *See* [*id.* at 355-56].

Though acknowledging that Dr. Rufner is a treating source, the ALJ afforded her opinions little weight. The ALJ explained that Plaintiff's treatment records were generally normal; that Plaintiff worked 25 hours per week; that Plaintiff delayed back surgery, suggesting "it was not a pressing matter"; and that Plaintiff had "minimal treatment records and only one mention of physical therapy without any follow up." [#16-2 at 26]. Thus, the ALJ afforded little weight to Dr. Rufner's opinions. *See* [*id.*].

Ms. Ojeda Perez argues the ALJ improperly afforded Dr. Rufner's opinions little weight, because the ALJ "cherry picked evidence from the record." [#20 at 5]. Plaintiff contends that Dr. Rufner "is the only treatment provider [Plaintiff] has seen for the combination for her impairments" and has consistently noted Plaintiff's chronic back pain—pain that interferes with Plaintiff's sleep. *See* [*id.* at 4]. Ms. Ojeda Perez further contends that Dr. Rufner's treatment notes do not reveal "'generally normal' findings," but rather confirm Ms. Ojeda Perez's degenerative disc disease, abnormal gait, and muscle tenderness, which generally corroborate Dr. Rufner's opinions. *See* [*id.* at 4-5]. Ms. Ojeda Perez also rebukes the ALJ's additional reasons for discrediting Dr. Rufner's opinions—that Plaintiff worked 25-hours per week during the relevant period and showed improvement by not having back surgery. *See* [*id.* at 5-6].

13

The Commissioner responds that the ALJ sufficiently explained the reasons for affording Dr. Rufner's opinions little weight. That is, the ALJ highlighted Plaintiff's generally normal physical exams, which are inconsistent with Dr. Rufner's extreme restrictions on Plaintiff's functionality; the ALJ also noted the inconsistencies within Dr. Rufner's treatment notes and her opinions on Plaintiff's functionality; and the ALJ permissibly found Dr. Rufner's limitations inconsistent with Plaintiff's ability to work (even if part-time), her daily activities, and her delay in seeking back surgery. *See* [#24 at 7-10]. I respectfully agree with the Commissioner.

First, the ALJ was not required to give controlling weight to Dr. Rufner's opinions merely because she was Plaintiff's treating physician. Rather, "[t]he ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). To be sure, Dr. Rufner had the longest treatment relationship with Plaintiff, but this is just one factor the ALJ is to consider in weighing treating source opinions, and the ALJ gave several valid reasons for discrediting Dr. Rufner's opinion. *See Walker v. Comm'r, Soc. Sec. Admin.*, No. 19-CV-00099-NYW, 2019 WL 6117801, at *9 (D. Colo. Nov. 15, 2019) (concluding that treatment relationship did not, in and of itself, require the ALJ to afford great weight to a treating source opinion where the ALJ gave legitimate reasons for affording little weight to the opinion). Namely, after conducting a thorough discussion of the relevant medical record, much like the court has done here, the ALJ found the record to contain mostly normal exam results. *See Oldham*, 509 F.3d at 1258 (holding that the ALJ's discussion of contrary, well-supported medical evidence provided a sufficient basis for giving a treating source opinion very little weight).

Second, while the court agrees with Ms. Ojeda Perez that the record in certain instances supports Dr. Rufner's opinions, the ALJ acknowledged those records as well as those that contradicted Dr. Rufner's limitations, including Dr. Rufner's own treatment notes that revealed normal exam findings. *See Barnhill-Stemley v. Colvin*, 607 F. App'x 811, 814-15 (10th Cir. 2015) ("Discrepancies between a treating physician's very restrictive functional assessment and that physician's contemporaneous treatment notes are a legitimate factor for discounting a medical opinion." (citing *White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2002)). Further, it is the ALJ's (not the court's) responsibility to resolve evidentiary inconsistencies, *see Allman v. Colvin*, 813 F.3d 1326, 1333 (10th Cir. 2016), and this court may not "displace the agency's choice between two fairly conflicting views," *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004) (brackets omitted). To find otherwise would require the court to reweigh the evidence before the ALJ—something the court may not do. *See Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).

Third, the court finds no error in the ALJ's reliance on Ms. Ojeda Perez's ability to work 25 hours per week during the relevant period. Consideration of a plaintiff's daily activities is appropriate when evaluating the limiting effects of a plaintiff's impairments. *See Wilson v. Astrue*, 602 F.3d 1136, 1145 (10th Cir. 2010). Though Plaintiff testified that, at the time of the ALJ hearing, she reduced her work hours to eight per week, the record contains several instances where Plaintiff indicated she worked upwards of 25 hours per week. *See, e.g.*, [#16-2 at 34; #16-6 at 198; #16-7 at 292, 301]. This fact, in conjunction with the inconsistent medical evidence discussed by the ALJ, was another permissible reason for affording Dr. Rufner's opinions little weight. *See Newbold v. Colvin*, 718 F.3d 1257, 1265-66 (10th Cir. 2013) (holding that the ALJ properly explained his reasons for assigning little weight to the plaintiff's treating source where the ALJ

discussed the inconsistencies between the treating source opinion and the medical record, the plaintiff's daily activities, and the treating source's own treatment notes).

Finally, the court is not convinced that the ALJ erred in discrediting Dr. Rufner's opinions given Plaintiff's delay in seeking back surgery. An ALJ may consider a plaintiff's unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment when determining whether the plaintiff's complaints of disabling pain are credible. *See Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993). Here, the ALJ found Plaintiff's justification for delaying her back surgery—waiting until her husband had surgery—suggested Plaintiff's back pain was "not a pressing matter." [#16-2 at 26]. But any error in reaching this conclusion is harmless, because the ALJ offered this as an additional reason for discrediting Dr. Rufner's opinions, not to wholesale deny Plaintiff disability benefits. *See Alarid v. Colvin*, 590 F. App'x 789, 793-94 (10th Cir. 2014) (finding no harmful error where the ALJ highlighted the plaintiff's failure to follow through with physical therapy in discrediting the plaintiff's subjective complaints of disabling pain, because the ALJ did not deny the plaintiff benefits for this reason and considered it only as a factor in her adverse credibility determination). For this reason, and those above, I find that the ALJ adequately explained his reasons for affording Dr. Rufner's opinions little weight.

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.

DATED: December 12, 2019

BY THE COURT:

/s/ Nina Y. Wang
Nina Y. Wang
United States Magistrate Judge